# WHEELING.

## RUFFNER'S HEIRS *v.* HILL.

### *(Absent, GREEN, JUDGE.)

Submitted January 24, 1888.—Decided June 30, 1888.

1. NEW TRIAL—EVIDENCE—INSTRUCTIONS—SUPREME COURT OF APPEALS.

   Upon a writ of error to an order of the Circuit Court setting aside the verdict of a jury and awarding a new trial, the plaintiff in error can not, for the purpose of having such order reversed, complain in this Court that the trial-court admitted illegal evidence, or gave the jury improper instructions. (p. 431.)

2. NEW TRIAL—REVIEW—DISCRETION OF TRIAL-COURT.

   When a new trial has been granted in such case, the opinion of the trial-court is entitled to peculiar respect, and the appellate court ought not to interfere with the order granting the new trial, unless, upon an examination of the whole evidence, it finds a clear preponderance of evidence in favor of the verdict. It is the constant practice in such cases to refuse to disturb such order, even where the court would have done the same thing had a new trial been denied. (p. 432.)

3. NEW TRIAL—EVIDENCE—DISCRETION OF TRIAL-COURT.

   The trial-court may in the exercise of a sound discretion set aside the verdict of a jury and award a new trial in a case, where the evidence is contradictory; but this discretion in such case should always be exercised with great caution, and a new trial granted only where the verdict is against the weight of evidence. (p. 432.)

4. SURVEY—BOUNDARIES—MONUMENTS—COURSE AND DISTANCE.

   Where the boundaries of land described in a survey can not be established by reference to known monuments, and the courses .and distances can not be reconciled, there is no universal rule which requires that one of these should yield to the other, but either may be preferred, as shall best comport with the manifest intention of the parties, and with the circumstances of the case. (p. 436.)

5. SURVEY—CORNERS—COURSES AND DISTANCES.

   Where all the corners of a survey are known and identified except one, and it is shown that the lines to and from that

---

*On account of illness.

corner were never run; that to establish said corner by the courses alone will locate it 200 poles from the terminus of the distance called for in the line approaching it, and, if located by allowing the full distance of this line, both course and distance of the line running from this corner must be violated to reach the next corner, which is fully identified; and it is also shown that there is a mistake of about 200 poles in the length of the line directly opposite the line approaching said corner, and that, to establish the corner by running the full distance of said line, the areas of the tracts of land dependent on the location of said corner for fixing the dividing line between them will much more nearly approximate the areas ascribed to them by the original survey and subsequent conveyances than if the said corner is located by the courses alone; *held,* the proper manner of locating said corner, under these circumstances, is to follow the course, and run the full distance of the line approaching it, and then close the survey by running a straight line from that point to the known corner. (p. 438.)

*J. S. Swann* and *J. H. & J. F. Brown* for plaintiffs in error.

*W. A. Quarrier* for defendant in error.

SNYDER, JUDGE:

The Commonwealth of Virginia, on March 4, 1796, granted to John Barclay a tract of 50,000 acres of land lying in Kanawha county, between Gauley and Elk rivers, and including the heads of Campbell's, Blue, Bell and Kelly's creeks. The said land having become forfeited for the non-payment of taxes, that fact was, in 1840, reported to the Circuit Superior Court of said county, pursuant to statutes then in force revesting the land, or the title to said land, in the Commonwealth, and providing for the sale thereof for the use of the literary fund. By an order of said court made at the spring term, 1840, J. M. Laidley and Thomas S. A. Mathews, the commissioners of delinquent and forfeited lands for said county, made a survey of the said land, whereby they found that it contained 72,381 acres, an excess over the quantity called for in the grant of 22,381 acres; and they subdivided the survey into 11 tracts, numbered from 1 to 11, inclusive, and reported the boundary and quantity in each tract to the court. A sale was ordered by the court, and at a sale made

by said commissioners, Laidley and Mathews, on September 14, 1840, Lewis Ruffner became the purchaser of lots Nos. 1 and 6, Daniel Ruffner of No. 3, and Joseph C. Kendall of lots Nos. 2, 4, and 10, respectively. These sales were all confirmed, and afterwards the lands were conveyed by said commissioners to the respective purchasers by deeds duly executed and recorded prior to the year 1850.

In December, 1871, this action of ejectment was brought by Joel Ruffner against George W. Hill and others in the Circuit Court of Clay county, (a county formed subsequent to the date of grant, and in which a part of said 50,000 acres of land then lay,) and it was subsequently removed to the Circuit Court of Kanawha county, where it was prosecuted thereafter. In December, 1875, there was a trial by jury, and verdict and judgment for the plaintiff, which judgment, on a writ of error to this court, was set aside, and a new trial awarded, because the record failed to show that any issue had been joined or plea filed by the defendant. *Ruffner* v. *Hill*, 21 W. Va. 152. The plaintiff, Joel Ruffner, having died, the action was revived and thereafter prosecuted in the names of his heirs as plaintiffs. The defendants disclaimed title or claim as to a portion of the land described in the declaration, pleaded not guilty as to the residue, and in April, 1885, a second trial was had by jury, and a verdict found for the defendants, which, on the motion of the plaintiffs, the court set aside, and awarded a new trial, upon condition that the plaintiffs pay the costs of the trial at that term.

During the trial the defendants saved several bills of exceptions, in one of which all the evidence is certified, together with certain instructions given for the plaintiffs, and others refused for the defendants, and the exceptions of the defendants to the rulings of the court upon said instructions, and to the order granting a new trial. The other exceptions are to the refusal of the court to permit the defendants to read to the jury certain papers and records. To review the action of the court in respect to the matters thus excepted to the defendants have obtained this writ of error.

The important question submitted for our decision is whether or not the Circuit Court erred in setting aside the

verdict of the jury and granting a new trial. Upon this question the defendants' exceptions to the rejection of evidence, and to the rulings of the court upon the instructions given and refused, can have no possible bearing. If all the evidence offered by the defendants had been admitted, all the instructions asked by them had been given, and all those given for the plaintiffs had been refused, the jury could not have found for the defendants any more favorable verdict than they did. It is therefore clear that the defendants could in no possible manner have been prejudiced by the rulings of the court in respect to these matters. Nor would it have been different if the court had admitted improper evidence for the plaintiffs. Unless the record affirmatively shows that the plaintiff in error has been prejudiced by the action of the court below, this Court will not reverse the judgment. *Shrewsbury* v. *Miller*, 10 W. Va. 115; *Miller* v. *Rose*, 21 W. Va. 291.

The only material inquiry, then, is whether or not the evidence in the record is of such a character as to make it the duty of this Court to set aside the order of the Circuit Court granting the new trial, and to enter judgment here on the verdict for the defendants. In setting aside the verdict of a jury the Circuit Court must, to some extent, pass upon the weight of the evidence before the jury. The decisions in Virginia and this State have fully established the rule that this right of the trial-court to pass upon the weight of the evidence in such cases is so sacred that a stronger case must be made to justify the appellate court in disturbing an order granting a new trial than where one has been refused. The reason assigned is that the refusal to grant a new trial operates as a final adjudication of the rights of the parties, while the granting of a new trial simply invites investigation, and affords an opportunity for showing the truth, without concluding either party; the discretion exercised in granting the new trial ought not to be disturbed unless a flagrant case of injustice is made. The effect of this rule is not to stifle investigation, but to allow another inquiry into the facts and a further hearing upon the merits. However the appellate court may be inclined to find from the evidence in support of the verdict, still it must be considered

that, the trial-court having had the witnesses before it, with superior facilities for determining the true weight of the evidence, and having, in the exercise of its sound discretion, granted the new trial, the appellate court ought not to interfere with the order granting the new trial unless, upon an examination of the whole evidence, it finds a clear and manifest preponderance of evidence in favor of the verdict.

Upon these grounds, and in view of the fact that a discretion is wisely lodged in the trial-court to set aside verdicts even in cases where the evidence is conflicting, it is the constant practice of the courts to refuse to disturb an order granting a new trial even where it would have done the same thing had a new trial been denied. *Patteson* v. *Ford*, 2 Gratt. 18; *Grayson's Case*, 6 Gratt. 712. In *Miller* v. *Insurance Co.*, 12 W. Va. 116, this Court decided as follows: "The court below may grant a new trial where the evidence is contradictory, and the verdict is against the weight of evidence; but in such cases the power of the court to grant a new trial should be very cautiously exercised. And when, in such case, the court below grants a new trial, the opinion of that court is entitled to peculiar respect; and, generally, the appellate court will not reverse the order of the court in such case. * * * Generally, a stronger case should be made to justify an appellate court in the disturbance of an order granting a new trial than when one has been refused."

In order to make the descriptive facts more plain and intelligible, the following diagram or map of the land in controversy is here made a part of this opinion: (See map.)

The boundary, U, A, B, C, 8, 10, R, S, 24, O, U, is a part of the original Barclay survey of 50,000 acres. There is no dispute as to the location and boundary of this survey. The commissioners of delinquent and forfeited lands, when they laid off the survey into lots, in 1840, made an actual survey of its exterior boundaries, and then, with the exterior lines thus surveyed, and by protracting the interior lines, they laid off and described the several lots by courses and distances, making the beginning corner of lot No. 1 at U, the beginning corner of lot No. 2 at O, the beginning of lot No 3 at C, and the beginning corner of lot No. 4 at " a post, corner to Nos. 1, 2 and 3." This last mentioned corner at " a

post," being at the *termini* of interior lines which were never run, is the only corner in dispute, and the whole controversy in this action is as to the true location of that corner. At the sale in 1840, the Ruffners purchased lots Nos. 1 and 3, and Kendall purchased lots Nos. 2 and 4. The plaintiffs claim title to lot No. 3 under the Ruffners, and the defendants claim No. 4 under Kendall. The boundary, C, F, G, Q, C, is the land demanded in the declaration ; and the boundary, E, F, G, Q, E, is the land in controversy, being about 800 acres.

The plaintiffs contend that the disputed corner is at F, while the defendants insist it is at E. This is the sole controversy between them. According to the survey and deeds of the parties, the boundaries and areas of lots Nos. 1, 2, 3, and 4 are as follows :   Lot No. 1 : Beginning at a large sycamore, buckeye, and sugar tree (U), on the bank of Elk river; thence up the river, with the meanders thereof, 960 poles to a beech (A) on the upper side of Queen Shoal creek, on the bank of Elk river; thence S. 34 E. 394 poles to a white oak (B), S. 58 E. 840 poles to three white oaks (C), S. 39 W. 1,200 poles to a post (disputed corner), N. $57\frac{1}{2}$ W. 1,880 poles to a white oak and black gum (O) on the bank of Leatherwood creek, N. 26 E. 1,140 poles to the beginning, containing 15,670 acres. Lot No. 2 :  Beginning at a white oak and black gum (O) on the bank of Leatherwood creek, S. $57\frac{1}{2}$ E. 1,880 poles to a post, corner to No. 1 ; thence S. 39 W. 1,420 poles to S, N. 70 W. 280 poles, N. $57\frac{1}{2}$ W. 1,000 poles, N. 60 W. 210 poles to 24, N. 26 E. 1,450 poles to O, the beginning, containing 14,493 acres.   Lot No. 3 : Beginning at three white oaks (C), corner to No. 1, thence S. 58 E. 792 poles to V, S. 34 W. 1,210 poles to a post, corner to Nos. 1 and 2, N. 39 E. 1,200 poles to the beginning, containing 6,450 acres.   Lot No. 4 : Beginning at a post, corners to No. 1, 2 and 3, S. 57 and $\frac{1}{2}$ E. 930 poles to a post, corner to Nos. 3 and 5; thence S. 34 W. 1,550 poles to R; thence, by several given lines, to S; thence N. 39 E. 1,420 poles to the beginning, containing 10,797 acres. The corners of lot No. 1 at U, A, B, C, and O are each identified.

The corners of lot No. 2 at O, S, and 24 are identified. Likewise are the corners C and V of lot No. 3; and the cor-

ners R and S of lot No. 4 are identified. The problem is to find the fifth corner of lot No. 1 at the post, which is also a corner of lots Nos. 2, 3, and 4. To find this corner, course must yield to distance, or distance must yield to course, as it is impossible to connect the survey by adhering to both. The corners at C and O are fully identified. The call of the line from C is S. 39 W. 1,200 poles, and the call from the terminus of this line to O is N. 57½ W. 1,880 poles. The corners at C and O being known and identified, the inflexible rule of law is that the two intervening lines must be so run that the one shall begin at C, and the other terminate at O. But, when these lines are actually run, we find the course and distance (S. 39 W. 1,200 poles) called for on the line beginning at C will take us to F; and in order to reach O from this point will require this line to be run N. 46 W., instead of the call N. 57½ W.,—thus necessitating a variation of the course 11½ deg.

If, on the other hand, we begin at O, reverse the course, and run the line according to the call, it will intersect the line from C at the point E, but this point is only 907 poles from C, while the call is 1,200 poles. Thus to establish the corner at E will make the line from C nearly 300 poles shorter than the call. The plaintiffs contend that the course and distance of the line beginning at C must be run according to the call, which will locate the disputed corner at F, and then run a straight line to O, regardless of the course and distance called for on the line. The contention of the defendants is that, in all cases when it become necessary to violate either course or distance, the latter must yield, and the course be adhered to, and that the disputed corner in this case must be ascertained by beginning at O, reversing the course, and running the degree called to the line from C, and where the two lines from C and O, thus run, intersect is the proper location of the disputed corner. This would locate the corner at E.

According to these facts, whether the corner should be established at E or F is purely a question of law, and, in order to solve it, we must first determine whether or not it is universally true, as insisted by the defendants, that, when it

becomes necessary to disregard either course or distance, the latter must yield in all cases to the former.

In *Smith* v. *Chapman*, 10 Grat. 445, Judge Lee, in delivering the opinion of the court, at page 459, says : " To say that distance shall yield to course, or *vice versa*, where there is a conflict between the distance of one line and the course of another, would be entirely arbitrary ; and the true rule seems to be that the one or the other shall be preferred according to the manifest intent of the parties, and the circumstances of the case ;" citing *Preston* v. *Bowmar*, 2 Bibb 493 ; *Loring* v. *Norton*, 8 Greenl. 61 ; and *Scamman* v. *Sawyer*, 4 Greenl. 429.

The court in *Preston* v. *Bowmar*, *supra*, after stating the general rule that, where the lines and corners of the survey are identified, the courses and distances must yield to them, although they may vary from the courses and distances called for in the grant, says : " But in such case, if the lines and courses which are found vary in length or course from the length or course of the corresponding lines and corners of the patent, in ascertaining the position of the last lines and corners, it will be necessary to vary either the course of some of them, or the distance of others, in order to make the survey close. In a case of this kind, it becomes a matter of importance to determine whether the course or distance is to yield. * * * To make the survey close, that line must either depart from its course, or one or both lines must depart from their distance. * * * In such a case, to presume a mistake in distance rather than course would be perfectly arbitrary, and no man ought to be permitted to extend the boundaries of his land upon such a principle. * * * The necessity of presuming a mistake in either is obviously produced, in a great measure, by the mistake which is found to exist in the courses of the lines extant. As, therefore, when the necessity of presuming a mistake of distance in some, or of course in others, of the lost lines, is produced by a mistake which is found in the length of lines extant, we adopt the presumption of a mistake in distance rather than in course, so, by a parity of reason, when the same necessity is produced by the existence of a mistake in the course of lines extant, it would seem proper to presume

a mistake in the course rather than in the distance of the lost lines. In this way the necessity of presuming a mistake of either course or distance will be made to operate according to the cause that produced it." In that case, course is made to yield to distance, and the decision was affirmed by the United States Supreme Court. 9 Wheat. 580.

*Loring* v. *Norton, supra,* decides : " When the boundaries of land described in a deed cannot be establised by reference to known monuments, and the courses and distances cannot be reconciled, there is no universal rule which requires that one of these should yield to the other ; but either may be preferred, as shall best comport with the manifest intent of the parties, and with the circumstances of the case." For the same doctrine, see *Scamman* v. *Sawyer, supra ; Fullwood* v. *Graham,* 1 Rich. Law 491; *Clements* v. *Kyles,* 13 Grat. 468.

In *Ayers* v. *Watson,* 113 U. S. 594, 5 Sup. Ct. Rep. 641, the court, following the Texas decisions, in which state the land in controversy lay, held that, " in the location of lands described in a grant, course controls distance, and distance controls quantity." This seems to be the rule in the Texas courts, but I have found no decision in any other State which holds the doctrine that it is a fixed rule that courses should control distances.

The rule established by the Virginia decisions above referred to is obligatory upon this Court; and those decisions, and the others cited therein, from which I have quoted, seem to me to establish these propositions : (1) That where there is a conflict between the distance of one line and the course of another, either the course or the distance shall control, according to the manifest intent of the parties and the circumstances of the case; (2) where it can be ascertained from the lines and courses extant that the mistake is produced by an error in one of the courses, then the correction ought to be made with reference to that mistake, so as to make the survey conform as near as may be, without violating established principles of law, to the manifest intent of the parties, and, on the other hand, where it is shown by the extant and identified lines and corners of the survey that the mistake is produced by an error in the distance of one of

the extant lines, then the correction ought to be made with reference to that mistake, so as to give effect as far as possible to the manifest intent of the parties; (3) and, in applying these rules, the shape of the survey as originally platted, and the quantity of land called for, may be considered, though the weight to be given to these is generally very inconsiderable. *Steele* v. *Taylor*, 3 A. K. Marsh 225, 13 Amer. Dec. 151; *Bryan* v. *Beckley*, Litt. Sel. Cas. 91, 12 Amer. Dec. 276.

In the case at bar there was some evidence tending to show that there were marks on timber along the line from O to E, indicating that that line has been actually run when the survey was divided, and the lots laid off, in 1840; but the great preponderance of the evidence is that none of the interior lines of any of the lots were then surveyed, but that they were merely protracted or platted out from the known lines and corners of the survey. There was also some evidence tending to show that the claim, and certain acts of the plaintiffs, and those under whom they claim, are inconsistent with the assertion now made, that the true location of the line is from O to F. This evidence, however, is very slight,—too much so to justify this Court in reversing the order of the trial court granting a new trial. In order to do so according to the principles heretofore stated, we should have to regard this evidence as clearly and manifestly preponderating over that which is in conflict with it. We not only think that this is not so, but that the converse is true.

Excluding these extraneous matters as irrelevant, we come to the decisive question whether, according to the manifest intent of the parties as explained by the admitted facts and attending circumstances, the course on the line from O should be adhered to, and the line from C shortened, so as to fix the corner at E, or should the line C be given its full distance and the course from its terminus varied to reach O, so as to fix the corner at F? The facts conclusively show that there was a mistake of over 200 poles made in the distance of the line, O, U. The distance called for is 1,140 poles, while it is in fact 932 poles. It will be observed that this is the line which is directly opposite to and almost parallel with the line, O, U, in which the mistake is shown to exist. If we

were permitted to extend the line, O, U, the full distance of its call, that is, make its length 1,140 poles, it would end at K, and then run the course and distance from that point it would fix the corner at F. If that were done, the quantity of land in both lot No. 1 and lot No. 2 would correspond with the quantity ascribed to each in the division; and such would be the case with the lots Nos. 3, 4, 5, 6, etc.* But if O, E is established as the true line, then the area of No. 1 will be greatly less, and that of No. 2 correspondingly greater, than the area called for; and the same change would be produced in all the other lots touching that line. But, as O is an established corner, the lines must be run so as to reach it, regardless of the calls for course and distance. Running a straight line from F to O will still give lot No. 1 a much less area than the conveyances ascribe to it, and give to No. 2 a correspondingly greater area, but it will have no effect upon any of the other lots.

It seems to me, therefore, that to establish F as the true corner, and thus make O, F, G, H, W the general division line between the lots, would be much more in accordance with the manifest intent of the parties, and do greatly less injustice to any of the lot-owners, than would be the case if E is established as the true corner, and O, E, Q, I, N, is made the general divison line between the lots.

My conclusion therefore is that the proper mode to find the post or fifth corner of lot No. 1 is to run from O, the full course and distance of that line; and, at the point where the distance terminates, the fifth corner should be established, and from these close the survey by a straight line to O, disregarding the call of the latter line both as to course and distance. But this conclusion is predicated upon the hypothesis that there will be no sufficient evidence before the jury at the next trial to warrant them in finding that the interior lines of lot No. 1 were actually run, or that said fifth corner was in fact located at some other point. This is precisely what was directed to be done by the Supreme Court of the United States in *McEwen* v. *Den*, 24 How. 242, 246, and is in harmony with the authorities hereinbefore cited. The result of this conclusion is that the judgment of the Circuit Court granting a new trial in the case must be affirmed.

Our duty in regard to this writ of error ends here; but as the case must go back to the Circuit Court, to be again tried there, our Constitution requires us to consider all the points fairly arising upon the record which may affect such re-trial. The first question of this character is whether or not the Circuit Court erred in refusing to permit the defendants to read to the jury the records in two cases,—the one a chancery suit in which the Ruffners, under whom the plaintiffs claim, were plaintiffs, and J. C. Kendall and others were defendants, and the other an action at law in which said Kendall, under whom the defendants claim, was plaintiff, and George Young defendant. The latter cases is wholly *inter alios acta.* Neither the plaintiffs here, nor any one under whom they claim, were parties to it, and therefore it was wholly inadmissible as evidence in this case. The chancery suit was brought to have Kendall, as the purchaser of lots No. 2 and No. 4, declared a trustee, and as holding the title to said lots for the use of the plaintiffs. This suit in no manner involved the title, possession, or boundary of lot No. 3, the one under which the plaintiffs claim. The bill was dismissed on the hearing, and I can discover nothing in the record that would be competent evidence in this action. The record of it was therefore properly excluded from the jury. For the same reason the court rightfully excluded the deeds referred to in the defendant's second bill of exceptions.

The court gave three instructions for the plaintiffs, all of which have reference to the proper manner of establishing the fifth, or post, corner of lot No. 1, and are in accord with the views expressed in this opinion on that subject. The court did not err in giving these instructions, for the reasons stated in this opinion. The defendants requested thirty instructions, three of which were given by the court, and all the others refused. Of the instructions so refused, not less than 16 are more or less in contravention of the instructions given for the plaintiffs, and in conflict with the legal principles hereinbefore announced. Consequently the court did not err in rejecting them. The other instructions have reference to what was in fact, or assumed to be, the evidence before the jury at the trial; and, as this may be varied at the next trial, no useful purpose could be subserved by an attempt to

prejudge the case, or anticipate the character of the instructions which may be requested by counsel who were capable of presenting sixteen instructions on a single point at the former trial. Without, therefore, approving or disapproving the other instructions requested by the defendants, including as well those given to the jury as those refused, it seems to me sufficient to say that the legal principles announced in this opinion, taken in connection with other decisions of this Court on the subject, cover all the points that can be legitimately raised as to the law of this case. The order of the Circuit Court granting the new trial is affirmed.

---

WOODS, JUDGE, dissenting:

I am unable to concur in, and therefore dissent from, the opinion of Judge Snyder and his reasonings therein, in sustaining the ruling of the Circuit Court in giving, without qualification, the three instructions asked by the plaintiffs, numbered respectively 3, 4 and 5, as set forth in the defendants' third bill of exceptions. I am of opinion that said instructions, in the form in which they were given, were unwarranted by the evidence introduced on the trial, because they wholly ignored the evidence introduced by the defendants tending to prove, that as early as 1843–44 there were several trees marked fore and aft as line trees on the line running from O to E, and that this line was a marked line; that there were at that time at least five persons living on lot No. 2, who held and claimed portions of said lot, mediately or remotely, under Kendall, who then owned the same, and that their several parcels, and their improvements thereon, recognized the line, O, E; and that at least three other persons then resided on and claimed parcels of lot No. 1, on the left side of the line, O, E, none of whose improvements extended over on the right of the line, O, E, except part of the Falling Rock farm,—which facts, if proven to the satisfaction of the jury, might have materially modified the effect of the recitals in the plaintiffs' said instructions. Being of opinion that the plaintiffs' said in-

structions, in the form in which they were given, did not properly propound the law in this case, I am of opinion the verdict of the jury was fully warranted by the evidence, and the same ought not, for any cause appearing in the record, to have been set aside.

But as a court may, under certain circumstances, properly set aside a verdict for many other causes than because it is contrary to the law and the evidence, it does not necessarily follow that because such a motion has been made, and the verdict has been set aside, that it has been set aside because, in the opinion of the court, it was contrary to the law and the evidence. In determining whether the verdict should be sustained or set aside, the court is not confined to the reasons on which the motion is founded; for, although the cause relied on in the motion may be insufficient, yet, if other good and sufficient causes appear to the court why the verdict should not be permitted to stand, it is the duty of the court to set the same aside.

But, if the trial-court set the verdict aside, the appellate court, in the absence of anything in the record to show the contrary, will presume that sufficient cause appeared to the court for setting the verdict aside. As the record in this case is silent on this point, I do not feel myself at liberty to presume that the Circuit Court improperly and without sufficient cause set the verdict aside. The party complaining of the action of the trial-court in such case must show by the record that sufficient cause for setting the verdict aside did not exist. The record in this case wholly fails to show this fact, and for this reason alone I concur with Judge Snyder that the judgment of the Circuit Court in setting aside the verdict and awarding a new trial must be affirmed.

I dissent from the proposition announced in the first point of the syllabus, because, in my judgment, it is unsound; for, as I understand it, this point would, if established, pervert the well-settled rule of practice that, although the trial-court may have erred to the prejudice of the plaintiff in error in setting aside the verdict, yet he shall not be heard to complain in an appellate court if it clearly appears to such court, from the evidence i

56

the record, that a different verdict ought to have been rendered. I dissent from the second and third points announced in the syllabus, because no such question was raised or considered in the trial-court or in this Court, and therefore it is unnecessary, as well as improper, to decide them. I concur in the fourth point, but dissent from the fifth point, in the syllabus.

AFFIRMED.